The fourth case this morning, Levin v. Miller. Good morning, may I please just... Still filing out. May proceed. Good morning, may it please the court, I'm Alfred Lurie of the law firm of Kilpatrick Townsend in Stockton, appearing today on behalf of the plaintiff appellate, Elliot D. Levin, the trustee in bankruptcy for Irwin Financial Corporation, which I'm going to refer to today as the company. Prior to the closure of its two subsidiary banks in September 2009, Irwin Financial Corporation was a bank holding company, and when the subsidiaries were closed on September 18, 2009, the company filed for Chapter 7 bankruptcy that same day. The issue, we believe, that's presented in this appeal is whether the district court erred in granting summary judgment to defendants Miller and Ellinger, who were the CEO and CFO, respectively, of the company on the trustee's claim that they breached their fiduciary duties to the company by not providing the company's board of directors with an analysis by qualified restructuring professionals of the increase in asset value the company could achieve by a timely bankruptcy filing before a $76.15 million income tax refund was transferred by the company to its failing bank subsidiaries in June 2009. One of the alternatives available in this country to a company in dire financial straits is to take advantage of the bankruptcy process. Once a distressed firm's decision makers have a clear understanding about what is achievable in a bankruptcy setting, they can make an informed decision about the course of action it's in the firm's best decision, best interest to follow. In addition to the other advantages it can offer, bankruptcy has the salutary effect of preventing asset grabbing and ensures that creditors of the same level of priority are treated alike. Without an awareness of what a severely impaired firm's value would be in a bankruptcy setting, its decision makers are in no position to contrast that value with the firm's value as a founder in going concern. Under such circumstances, there's a considerable risk that the decision makers will make uninformed decisions that sacrifice value. The trustee submits that genuine disputes of material fact exist about whether that occurred in this case and whether defendants Miller and Ellinger are responsible for it. In particular, there are genuine disputes about whether an informed liquidation analysis was information that the company's directors needed to perform their fiduciary duties to the company and whether the defendants had a responsibility to obtain and provide it when there's no evidence that the directors ever instructed that they had no interest in considering such information. Actually, the undisputed evidence establishes that the board put the fate of this holding company in the hands of Raj Cohen from Sullivan and Cromwell and was not looking for bankruptcy advice from the officers. Well, Your Honor. I mean, it hired the premier law firm in the country to advise it on its regulatory obligations to keep the subsidiary banks afloat as well as, you know, other due diligence fiduciary obligations the board had to the holding company and used the advice it was getting from this and was telling the defendant officers to do what the board was directing them to do, which is to follow the plan that it had devised for keeping the subsidiary banks afloat in consultation with outside counsel. So I don't know how the officers could be liable for a breach of fiduciary duty under these circumstances. They were taking their orders from the board, and the board was making informed decisions in a very careful way at a very fraught time during the financial crisis from a very experienced outside counsel. But Your Honor, the directors, as was recognized in the district court's opinion, made it clear that they were interested in any alternatives that might be available to deal with the dire situation that the company found itself in. In fact, they, on a number of occasions— Not alternatives that conflicted with the goal of keeping the banks afloat to make the TARP loan possible. They weren't looking for those kinds of alternatives. They were singularly focused on keeping the banks afloat to make that TARP application viable as long a shot as that was. But Your Honor, they couldn't just be singularly focused on that goal because they had fiduciary duties to the company. That's a different argument. We're talking about what obligations these two officers owed to their principal as agents. That's right. And your argument depends on, you know, a chain with so many links as to make it speculative that the board would have behaved differently and put the company into bankruptcy sooner than it did. And including a speculative argument about whether there's a viable basis for the holding company to keep the entire tax refund, which is the subject of, you know, dispute in the bankruptcy community and among bankruptcy courts, especially where there's a tax allocation agreement, as there is here, that required sharing. In other words, precluded the holding company from keeping the tax return. So, I mean, so many links in your chain have to fall in your favor as to make it an incredibly implausible argument on a breach of fiduciary duty claim. But Your Honor, after the company filed for bankruptcy, it's undisputed in the record that the trustee in bankruptcy was able to negotiate with the FDIC to receive a substantial portion. Compromises happen all the time in litigation and particularly bankruptcy workouts. That's not an argument for breach of fiduciary duty. Compromise is the name of the game in that sort of situation. You've got limited assets. You've got to divide it up. That's not, you know, a concession that you had a slam-dunk argument and the trust or the two officers should have recognized it. It's far from a slam-dunk legal argument. It's a disputed issue in bankruptcy law. Exactly, it's a disputed issue. Right. And it's purely speculative whether it would have been viable had the company been placed into bankruptcy sooner and particularly in light of the undisputed evidence that the board put the fate of the company essentially in the hands of the outside legal counsel that was devising a plan to make TARP application viable in this, as I said, very fraught environment. Yes, and when the board... This is a very thin read. When the board hired Sullivan and Cromwell, Your Honor, it was not clear that there was no realistic possibility that the banks would survive. It's our contention that there's at least a genuine issue of material fact about whether there was any realistic prospect that the banks would survive by the May-June 2009 period given what had occurred in May. Right. But officers of the company are not required to give by their fiduciary obligation to their principal to give the principal information in contradiction to the principal's manifested orders essentially. Orders may be too strong a word, but it's clearly the board manifested an intent to put the company on this path of trying to save the subsidiary banks. Your Honor, there's evidence... That's the board's manifest intent and made it clear throughout this period. And to argue that these two officers had a fiduciary obligation to suggest an earlier bankruptcy and are liable for not doing so is really just an implausible basis for a fiduciary duty claim. Your Honor, it's not clear that the board manifested a desire not to receive any information about what advantages the company might be able to achieve in a bankruptcy scenario once it had become clear, as it had by May of 2009, that the banks were not going to survive. And there's evidence in the record that the directors were continually searching for alternatives and asking if there were other alternatives that were available that management had not identified. Alternatives that would allow the company and the banks to survive as going concerns. Not an earlier bankruptcy to maximize value for the creditors. I mean, that's basically your argument. No, the argument is that having been advised by their outside counsel that the directors were not required to and could not favor the interests of the bank's depositors over the interests of the company and its other stakeholders. And that if they did that, that could expose the company, the directors, and the officers to legal liability. It's not at all clear that if this alternative had been made available, the existence of this alternative had been made known to the directors, that the directors would have decided that even though there's an alternative that's available for maximizing value for the company, that they were going to continue to manage this situation in an effort to obtain a soft landing, as soft landing as possible, for creditors of the wholly owned subsidiary. I mean, it stands corporate governance law on its head to say that officers of a parent corporation can manage the situation for the benefit of creditors of a wholly owned subsidiary. And this is particularly the case when the company is insolvent. This is a heavily regulated environment, and the board had serious regulatory obligations under both state and federal regulators, and they were being ordered to protect the depositors. No, the board of the holding company did not have an obligation under federal law to protect the depositors of the banks. The board of the holding company had fiduciary duties to the holding company to manage the in the best interest of the holding company and its stakeholders. And even the district court acknowledged that the company was not legally compelled to transfer its assets to the banks and that there was no compulsion under federal law for the directors or the company to have to do that. The board was legally obligated, the holding company was legally obligated, to be a source of strength to the subsidiary banks. That's the legal principle in this domain, and to ensure adequate capitalization. And that's what the board's goal was, and that's what the regulatory auditors were requiring the board to do. They were consulting with both outside counsel and the board along the way, all along the way. Until Dodd-Frank was passed in 2010, there was no statutory basis for the source of strength doctrine compelling a holding company to infuse its assets into failing bank subsidiaries, and the district judge recognized that in her decision. But the regulators were imposing that requirement, imposing that expectation. But the regulators couldn't impose that requirement on the directors of the holding company. Whether or not they could is beside the point. The bottom line is that it's undisputed that they did. And the board was adhering to what it understood to be its regulatory obligations imposed by the state and federal regulators that were breathing down its neck and working with outside counsel to devise a plan to keep the subsidiaries afloat. And that's all that's necessary here to defeat your claim. Whether the regulators were right to make that a requirement or an expectation is a separate question. If the board had been advised by bankruptcy counsel with experience in bank holding company bankruptcies who are bankruptcy counsel, the board would have been advised that if the board put the company into bankruptcy, that would be the end of any pressure on the board to downstream companies' assets into the failing bank subsidiaries. It would have been a perfect solution for the board. The board would have been entirely insulated by the filing of the bankruptcy case under which a trustee in bankruptcy would take over the company and take over the administration of the company's assets and secure to the bankruptcy estate the benefit of the value of the estate's claims to ownership of the tax refunds. So, again, Your Honor, I don't believe... Your time is up. Thank you very much. Thank you. May it please the Court. My name is Kevin Coons. I'm here on behalf of the appellees, Mr. Miller and Mr. Ellinger. Your Honors, Judge Barker's summary judgment order ought to be affirmed because, as Judge Sykes recognized, the core undisputed facts in this case are dispositive, and I'd like to focus on three main points. The first is that the officers on the undisputed facts  who developed their own business judgment relying on the advice of its independent counsel, Mr. Cohen from Sullivan-Cromwell, and the advice of regulators. Secondly, the trustee has failed to identify any information based on evidence in the record that ought to have been provided to the board of directors. And then third, neither the parent company nor its shareholders were harmed by transferring the tax refund that came in at the parent level down to the subsidiary bank as a result of a preexisting obligation that even the trustee recognizes existed. So, therefore, the trustee's now... His claim rests entirely on a duty owed to creditors because neither the company nor the shareholders were harmed that relies on Delaware law of the zone of insolvency or a trust fund theory that Indiana has repeatedly and expressly rejected. Those, to my first point on the officers following the direction of the board, here are the core undisputed facts. It was an independent board who went out and hired on their own one of the nation's top lawyers in banking to advise them specifically on fiduciary duties. They expected the officers to follow the advice they got from counsel. The counsel, Mr. Cohen, advised the board on the source of strength doctrine, and even if it wasn't an enforceable doctrine as it's spelled out in the statute, it was clear from even the parent company's own 10-K filings that they believe the doctrine to be enforceable and that they advised creditors and investors alike if we are called upon to be a source of financial strength to our banks, even if we don't think we can do so, we're going to do it. Another core undisputed fact is that the officers gave timely weekly memos to the board updating them on what was happening with capitalization, what was happening with the TARP application. And then my final point on this area is that undisputed fact is that the lead outside director, Mr. Odden, we included his affidavit in our supplemental appendix, but he says, I read all through the count to claims, and each one of these actions was taken at the direction of the board. We had directed the officers to do this based on the advice of counsel and the regulators, and we did this because we thought this was going to avoid the most widespread harm. The trustee talks about maximizing value. That's not the standard in Indiana for the best interest of the corporation, and that's in our business judgment rule statute. Our business judgment rule statute allows the board to take into consideration all sorts of constituencies, including customers, including the communities where its offices are located. And to say that the depositors of the subsidiary bank are merely creditors of the subsidiary is ignoring the practical reality that at this whole enterprise, the depositors are part of the lifeblood of the bank. Its depositors are the parent holding's customers. And so it was appropriate then for the board not only to listen to regulators, but also to take into consideration what regulators were saying a liquidity crisis or capitalization crisis would have on depositors, particularly depositors of public monies. The municipalities and cities and towns across Indiana had deposits on file at the bank. The trustee takes some liberties with the record, and I want to point out two examples. The first is at the May 7 meeting leading up to the tax return. This is where the board met independently with its regulators. The trustee says that the board told the officers, you need to consider every alternative. Well, they ended the quote there in their reply brief at page 9. What the board said was, we want you to look at every alternative to ensure a soft landing for stakeholders. In those minutes, and that's at page 389 of the appendix, two pages earlier, page 387, the board had just been talking about who are the stakeholders. And they said, for example, they're telling the officers this. For example, take care of depositors. Make sure you get them from an uninsured status to an insured status while we're managing this crisis. The second point I want to make is that there was an absence of any evidence of information that the board, that the officers should have provided to the board. The only information identified is some legal abstract argument. The cases were in flux and bankruptcy courts about how tax allocation agreements were to be treated in a bankruptcy context. But there's no evidence of the record about what the trustee claims should have been provided to the board. I want to point out, too, that he now says that a bankruptcy professional should have been consulted. Well, they already had a consultant. It was Raj Cohen from Sullivan and Cromwell. They have bankruptcy lawyers in their office. Had our clients gone out and hired yet another bankruptcy professional, they potentially could have opened themselves up to claims of corporate waste for expending valuable resources during a distressed time on hiring somebody that the board simply had no interest in hearing about. It puts the officers in a very untenable situation because I'll remind the court, in the original complaint that the bankruptcy trustee brought, it included one count for this very issue of unnecessarily hiring a consultant and wasting corporate money on outside consultants. So the officers are kind of in a damned if I do, damned if I don't situation that's untenable, unworkable. The last point I'd like to discuss is the fact that there's no harm to the parent company, to its shareholders, and so the trustee has to rely on this zone of insolvency theory or trust fund theory that Indiana law has rejected. The actual transfer of the money was simply to pay a debt owed. In essence, it was favoring one creditor over others. And as the holding company, regardless of whether it was solvent or insolvent, it was never going to be able to hold on to that $76 million that came in as a tax refund because of the trustee admits. There was a tax allocation agreement that required it to pay that money to the subsidiary bank. And so there's no harm. In the Geiger and Peters case that we cited in our brief, this is an Indiana Court of Appeals case that rejected the trust fund theory. It said corporate fiduciaries owe their duties to the corporation and its shareholders, not to creditors. And the reason why is because it puts them into this untenable situation where at some point the interests of a shareholder and the interests of the creditor are going to be divergent. And what's a corporate fiduciary to do? And this case actually illustrates that because think about it. If the holding company is never going to be able to hold on that money anyway, if a firm is insolvent, it's never going to go to shareholders. So why not send it down to the subsidiary bank in the hopes that even if there's a 1% chance that the TARP application is going to be approved, why not send that down to the bank on the off chance that that 1% happens and that the TARP application be approved and we've saved the company? The only harm is to creditors. And Indiana law is very clear. There is no duty to creditors. As a final thought, I think the court ought to consider the purposes of tort law, which is to both compensate injured individuals and then to also regulate conduct. As far as regulating conduct in this case, what should they have done? I mean, if the trustee's claim goes forward and there's liability for following your board and following regulators, I don't think that's the kind of message we want to send in the next case that officers ought to be ignoring regulators and providing information to their board that they're not interested and that would go contrary to public policy. So for all these reasons, we'd request the court to affirm summary judgment. Thank you. Thank you. Thanks to both counsel. The case is taken under advisement. Move to the.